OF

# The State of Missouri

AT THE

## OCTOBER TERM, 1883.

(*Continued from Volume 78.*)

---

GREENWADE, *Appellant*, v. McCORMACK.

An Injunction against Sale of Land under a Deed of Trust was
sought by a subsequent purchaser thereof; and his vendor, who
was the maker of the trust deed, the payee of the note secured
thereby, the trustee and the parties claiming to be the then legal
holders of the note, were made defendants. It appeared that the
maker of the trust deed, by reason of some mistake in the calcula-
tion of the amount of debt, had executed two notes, instead of one,
which were substantially alike except in amount, and that he neg-

ligently failed to destroy the note not needed, and that both came into the possession of the payee who negotiated both for his own use. This court upon an examination of the evidence finds (1) That the note corresponding in amount with that described in the deed of trust and held by the parties defendant claiming to be the legal holders thereof, is the genuine note intended to be secured by the trust deed, and that such parties hold the same as collateral security for an indebtedness to them by the payee; (2) That the plaintiff, who had paid the spurious note to the payee upon his threat to foreclose the deed of trust, was divested of any equity he might thereby have acquired by the maker having refunded the amount to him, and that he held the land subject to the lien of the genuine note, and that the maker acquired no equity by the payment of the spurious note, because, prior thereto, he had received notice of the genuine note, and its settlement had been solicited of him; and (3) As evidence had been offered of the payment of the indebtedness for which the genuine note was collateral, and excluded by the trial court, *Held*, that the case be remanded with direction to receive such evidence, and if the trial court should find such indebtedness to have been paid, to make the temporary injunction perpetual, and if not, to dissolve the injunction and dismiss the bill.

*Appeal from Lafayette Circuit Court.*—HON. WM. T. WOOD, Judge.

REVERSED.

*Rathbun & Shewalter* for appellant.

*Wallace & Chiles* for respondents.

MARTIN, C.—This is a bill in equity filed on the 5th day of August, 1878, asking for an order enjoining a sale under power in a deed of trust, also for decree of cancellation and surrender of the note described in it, and of the discharge and satisfaction of record of the deed of trust. The plaintiff sues in the capacity of possessor of the only note for which the deed remains as security, as well as owner of the land covered in the deed. He alleges that the note held by him is the true note secured by the deed of trust, and that it has been paid; that the note for payment of

which the trustee in this case advertises to sell, is not the note intended to be secured by the deed, and that it was not indorsed or delivered to the present holders of it for value, but is held by them subject to the plaintiff's equity to have it cancelled and surrendered. A temporary injunction was granted by the court until further order in the premises. Such defendants as are interested in the note, deny the allegations of the petition, claim that the note so held by them is the true one secured in the deed of trust, and that they hold it for value and free from the pretended equities of plaintiff. A replication puts the new matter in issue. At the hearing of the cause considerable evidence both oral and documentary was submitted to the court. On the evidence so received, the court found the issues in favor of the defendants, dissolved the injunction, and dismissed the bill, from which action of the court the plaintiff has appealed.

The facts of this case are somewhat unusual and complicated. They illustrate very significantly the mischief and perplexity apt to ensue, when fraud avails itself of the advantages of negligence and mistake. It seems that one Isaac H. Reed was the owner of a tract of land in Lafayette county, known as the Downing farm, consisting of about 220 acres, which was subject to certain incumbrances, some of which were held by said Downing, and others, which had been placed upon it by Downing, in favor of creditors of his.

Mr. Reed, for reasons better known to himself than to his creditors, held this farm in the name of Martha E. Reed, his wife, but in all things dealt with it as his own, using her name when necessary. In April, 1876, he negotiated a trade or exchange of his farm with one George W. McCormack, a resident of Kentucky, who was visiting Lafayette county. By the terms of this exchange Mr. McCormack transferred other lands to Reed or to his use, which represented all the consideration of the exchange except $1,-698.71. This amount he undertook to secure by deed of

trust in favor of Downing and Reed. Downing held a lien on the land and McCormack owed him a small sum. It was agreed that McCormack would assume the lien by execution of the deed of trust. Accordingly the deed was prepared reciting two notes, one in the sum of $925 in favor of Downing, and the other for $773.71 in favor of Martha E. Reed. The Downing note has been paid and satisfied of record, so that it does not figure in the case.

Mr. Ridgeway, a justice of the peace, prepared the deed of trust and the note for $773.71 described in it, and delivered them to McCormack for examination and execution. By reason of some miscalculation of the amount to be secured by the deed of trust, the exact character of which does not appear in evidence, McCormack, either before or after signing the note for $773.71 signed one for $765, both payable to the wife of Mr. Reed. These two notes are substantially alike in all respects except the amounts. They are not literally alike. Of course only one of these notes was intended to be covered by the deed of trust. The one not so covered, was an abandoned piece of paper, and ought to have been destroyed. It was not destroyed, but was negligently left on the table after the negotiations ended. It was taken charge of by Mr. Reed, a party to this suit, who, according to the evidence in the record, I regret to say, does not seem distinguished for that integrity of conduct which constitutes a necessary passport in a court of equity. Mr. McCormack took the deed of trust with him to Kentucky for the purpose of having it signed and acknowledged by his wife. After the execution and acknowledgment it was returned to Missouri to the beneficiaries. Reed became possessed of both notes, and negotiated both for his individual use.

The first point of inquiry is as to which note was intended by McCormack to be secured by the deed of trust; which one did he deliver for that purpose. The evidence on this point is conflicting, and no light is thrown upon it by McCormack in his deposition. He is unable to say

which note was executed first. Neither can he, or any one else, give the calculations which rendered it necessary to execute a second note. The theory of plaintiff's witnesses that the first note was executed for $773.71, and that the second one was executed for $765 to correspond with the true amount of the indebtedness, is not supported by the evidence. The note for $773.71 corresponds with the deed of trust and requires nothing to identify it. The pretense of plaintiff that after the note for $765 was executed, the recital was included in it, to indicate that it was secured by the deed of trust, amounts to nothing in face of the fact that the other note contains a similar recital. Mr. Ridgeway, who prepared the deed of trust and note for $773.71, is under the impression that both this and the Downing note were left with him till after the return of the deed of trust from Kentucky, when they were handed to the respective beneficiaries.

After the return of the deed from Kentucky, and before that, Reed must have known which was the genuine and which was the spurious note. His conduct, therefore, in relation to the two notes when measured by the admitted motives under which he acted, must speak very convincingly on this point. Now both notes were payable to Mrs. Reed, his wife, and he was anxious to borrow money on the strength of his security. It was the note for $773.71 which he submitted to her for her signature. The other note he never did submit or show to her. The one so submitted to her she signed, and he endeavored to borrow money from Taubman on the strength of it, but did not succeed.

His creditors got after him and in early May, 1876, he took the note for $773.71, along with a note by Downing for $91.50, and delivered them to the defendant James B. Hord, stating to him that he expected to go to Kansas, and requesting him to deliver them to his wife. The next morning Hord was garnished by Reed's creditors. A few days afterward Reed came to Hord in the field where he was working, and told him that he must have misunderstood

him about the notes, that he delivered them as collateral security for the debt of $1,700 which he owed Majors and Hord, and that they were not to be delivered to his wife. I may add here that Reed was a dissipated man; that he was drinking when he delivered the notes to Hord, and that his relations with his wife were probably becoming of an unfriendly character; that he separated from her in February, 1877, and was divorced by decree of court in Johnson county. His wife afterward married Isaac McVay, by which name she is made a party to this case. Upon Reed's declaration that the notes were delivered as collateral security for his debt to Majors and Hord, they were so accepted, and held to the present time.

The note for $765 was never indorsed by Mrs. Reed, nor was it used in any manner by Mr. Reed till August, 1876, when he delivered it as collateral security for a debt of $400 due a Mr. Little of Kansas City, after signing his wife's name to it.   While it was in the hands of Little or other creditors, they wrote a letter to McCormack in Kentucky offering to allow a discount if he would pay the note before maturity.   It afterward came back to the hands of Reed, who held it when it fell due in February, 1877.

It was natural for Reed with both notes in his pocket to make use of the genuine one first.   The worst of men seldom resort to issue of counterfeit or spurious paper until necessity and the want of better paper induces them to take the step.   It was certainly natural, when he undertook to conceal his assets from his creditors, to secure what was genuine and undoubted for his future use.   I think the note held by Hord and Majors is unquestionably the note which was intended to be covered by the deed of trust, and that the other note was abandoned and ought to have been destroyed.

But it is argued that the note for $773.71 is held by Hord and Majors only as collateral security for a debt, and that it is subject in their hands to the equity of plaintiff. It, therefore, becomes necessary for us to consider the equi-

ties which the plaintiff lays claim to.   If he has none, then none can be allowed to disturb the title of Hord and Majors, although they may hold the note as collateral security.

Greenwade is owner of the land, having purchased it by deed of general warranty, of February 20th, 1877, from George W. McCormack.   It seems that after the purchase Reed obtained the spurious note from his creditors in Kansas City, and by threats of foreclosing the deed of trust, compelled Greenwade to pay it.   This is certainly a step toward a superior equity in Greenwade.   But it also appears that by threats of a suit against McCormack in Kentucky, he compelled him to re-pay the whole of the amount paid out by him, and the receipt of such payment is acknowledged by Greenwade on the note by entry over his signature of October 22nd, 1878.   This leaves the matter in equity as if McCormack had paid the note.   Consequently Greenwade has no equity except what enures to him in McCormack's deed and his act of payment.   He has none of his own.

Now it is true the deed of trust was given to secure a debt, and the note described in the deed is only evidence of the debt.   And if McCormack has paid the debt once to the rightful owner of it, he cannot be called upon to do it again.   This act of his would discharge the debt and release the deed of trust.   If, however, McCormack after full notice of the true holder of the debt, chooses to pay it to the wrong holder, he has no defense when the right one comes upon him.   And this appears to be the condition of McCormack from the uncontradicted evidence in the case.   Mr. Majors testifies that he wrote to McCormack when the note for $773.71 fell due, informed him of the exact amount and the fact that it was secured by the deed of trust.   McCormack testifies to the same facts in his deposition.   Now at this time McCormack was informed of the other note.   He testifies in his deposition that the parties in Kansas City holding it, had written to him a short time after the deed asking him to discount it.   He had not paid it at the time of Majors' letter advising him of the genuine note.   More-

over, it appears that McCormack passed through Missouri after both notes were due, on his way to the west to see about establishing a newspaper in the country of the Black Hills, and that he was again informed of the Hord and Majors note and solicited to settle it. This was in August, 1878. Under these circumstances, McCormack, who as owner of the land gave the note held by Hord and Majors, has no equity as against them, and Greenwade, as his assignee, can have none.

Another phase of this protean controversy arises from the evidence of certain facts which have transpired since the institution of suit, which it will be necessary to examine for the purpose of determining whether they operate as a change or release of the rights of any of the parties. By deed of September 11th, 1878, Greenwade conveyed the land to James F. Downing, who seems to have owned it before Reed acquired title. This deed we are told was delivered about a month after its execution. It was not recorded until May, 1879. If Greenwade had any equity it would naturally pass to Downing, and the benefits of any decree would enure to him. But it seems that while Downing took the land *pendente lite*, he also took a bond of indemnity to protect himself against the adverse results of the case. This bond, strange to say, was furnished by Reed. It is argued by counsel for plaintiff that while the title rested in Greenwade it was held in secret trust for Reed. If this were so it would certainly make the defense of Hord and Majors stronger against the plaintiff.

But as Greenwade is without any equity in either event, it is unnecessary to stop to consider the cumulative effect of this position. McCormack cannot be called on again by Greenwade or Downing, his assignee, to pay the mortgage, because they have enforced one payment of it by him on the spurious note. McCormack remains liable to Majors and Hord as holders of the genuine paper. McCormack is insolvent, but his assignee in respect to the land cannot interpose any equity against an enforcement of the debt

against the land assigned by him. If the effect of the decree should fall upon Reed, by reason of his bond of indemnity, then the blow will finally fall on the party who contrived and plotted all the mischief. Upon the evidence contained in the record the equities are with the present holders of the note.

But unfortunately for them the plaintiff, just as the case was about to close, submitted evidence and offered to prove that the debt of Reed to Hord and Majors had been entirely paid off before suit brought. This was opposed by defendant on the ground that it was outside of the pleadings, and on the further ground, that, although the debt was paid, the note was unpaid and should therefore be enforced. The court excluded the evidence. This was an erroneous ruling. The evidence was certainly within the issues raised by the pleadings. The other ground of objection cannot be maintained. The evidence should have been admitted.

If it is true that Hord and Majors have been paid off upon the $1,700 due them from Reed, then the title to this note reverts at once to Reed, and they have no right to hold or enforce it for his benefit. If the deed of trust should under these circumstances be enforced by sale, the proceeds of the foreclosure would have to be paid to Reed, who pledged it to them only as collateral security, and who is entitled to it again after its release by payment of the debt for which it was pledged. This would enable Reed to receive payment of the debt twice. He has received it on the spurious note, and the decree under these circumstances would give it to him again on the genuine note. As against McCormack and Downing and Greenwade, there would be no equity in such a decree.

I may state here that Mrs. McVay disclaims all right or interest in the land and deed of trust, and admits that she only nominally represented herself on the paper, and that her husband was the real party in interest. When the issue stands between Reed and McCormack or any of the sub-

sequent owners of the land, the right of cancellation and satisfaction is complete.

In accordance with these views the decree of the circuit court is reversed and the case remanded for the purpose of receiving evidence only on the question as to whether the debt for which Hord and Majors retain the note has been paid. If from the evidence the court finds it has been paid off, then the injunction will be made perpetual, the note cancelled and satisfaction of the deed of trust adjudged. If it has not been paid off, then the court will enter a decree of dissolution of the injunction and dismissal of the bill. All concur.